**Case No. 24-13770**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

VICTOR PALENCIA GOMEZ et al.,
*Plaintiffs–Appellees*
v.
CHIQUITA BRANDS INTERNATIONAL, INC.,
*Defendant–Appellant*

On Appeal from the United States District Court
for the Southern District of Florida,
The Honorable Kenneth A. Marra/The Honorable Roy K. Altman
No. 08-MD-01916
(IN RE: CHIQUITA BRANDS INTERNATIONAL, INC. ALIEN TORT
STATUTE & SHAREHOLDER DERIVATIVE LITIGATION)

## APPELLANT'S BRIEF

Michael L. Cioffi
Thomas H. Stewart
BLANK ROME LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, OH 45202
(513) 362-8701/04
michael.cioffi@blankrome.com
tom.stewart@blankrome.com

Frank A. Dante
Melissa F. Murphy
Michael A. Stoolman
Serena S. Gopal
BLANK ROME LLP
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
(215) 569-5645/5334
frank.dante@blankrome.com
melissa.murphy@blankrome.com
michael.stoolman@blankrome.com
serena.gopal@blankrome.com

*Counsel for Defendant–Appellant, Chiquita Brands International, Inc.*

**No. 24-13770**

**Victor Palencia Gomez, et al. v. Chiquita Brands International, Inc.**

**Certificate of Interested Persons and Corporate Disclosure Statement**

Pursuant to Rule 26.1-2 of the Eleventh Circuit Rules, counsel for Appellant, Chiquita Brands International, Inc. ("Chiquita"), hereby certifies that no publicly held corporation owns 10% or more of Chiquita's stock. Pursuant to 11th Cir. R. 26.1-2(a), counsel for Appellant, Chiquita, states that the following is a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal, including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party:

Agrícola Bananera Santa Rita, S. de R. L.

Agroindustria Santa Rosa de Lima, S.A.

Alamo Land Company

Alexander, Lauren

Alsama, Ltd.

Altman, Hon. Roy K.

American Produce Company

Americana de Exportación S.A.

ASD de Venezuela, S.A.

B C Systems, Inc.

Berdugo Lechuga, Lina Maria

Blank Rome LLP

Blue Fish Holdings Establishment

Charagres, Inc., S.A.

Chiquita (Canada) Inc.

Chiquita Brands Costa Rica Sociedad de Responsabilidad Limitada

Chiquita Banana Ecuador CB Brands S.A.

Chiquita Brands International Sàrl

Chiquita Brands International, Inc.

Chiquita Brands L.L.C.

Chiquita Compagnie des Bananes

Chiquita Europe B.V.

Chiquita Finance Company Limited

Chiquita For Charities

Chiquita Fresh North America L.L.C.

Chiquita Guatemala, S.A.

Chiquita Holdings SA

Chiquita Holdings Limited

Chiquita Honduras Company Ltd.

Chiquita Logistic Services El Salvador Ltda.

Chiquita Logistic Services Guatemala, Limitada

Chiquita Logistic Services Honduras, S. de R.L.

Chiquita Mexico, S. de R.L. de C.V.

Chiquita Nature and Community Foundation

Chiquita Panama L.L.C.

Chiquita Relief Fund—We Care

Chiquita Tropical Fruit Company B.V.

Chiquita Tropical Ingredients, Sociedad Anónima

Chiquita US Corporation

Chiriqui Land Company

Chomsky, Judith Brown

CILPAC Establishment

Cioffi, Michael L.

Collingsworth, Terrence P.

Colombian Institute of International Law

Compañía Agrícola de Nipe, S.A.

Compañía Agrícola e Industrial Ecuaplantation, S.A.

Compañía Agrícola Sancti-Spiritus, S.A.

Compañía Bananera La Ensenada, S. de R.L.

Compañía Caronas, S.A.

Compañía Cubana de Navegación Costanera

Compañía Frutera América S.A.

Compañía La Cruz, S.A.

Compañía Productos Agrícolas de Chiapas, S.A. de C.V.

Compañía Tropical de Seguros, S.A.

Dante, Frank A.

de Leon, John

Desarrollos Agroindustriales del Istmo, S.de R.L.

Durango, Pastora

EarthRights International

Exportadora de Frutas Frescas Ltda.

Fontalvo Camargo, Juvenal Enrique

Fresh Express Incorporated

Fresh Express Vegetable LLC

Fresh Holding C.V.

Fresh International Corp.

Frutas Elegantes, S. de R.L. de C.V.

Fryszman, Agnieszka M.

Gopal, Serena S.

Great White Fleet Corp.

Great White Fleet Liner Services Ltd.

Great White Fleet Ltd.

Green, James K.

G W F Management Services Ltd.

Heaton Holdings Ltd.

Herz, Richard

Hoffman, Paul L.

Istmo Holding LLC One

Istmo Holding LLC Two

Kroeger, Leslie M.

La Ensenada Holding LLC One

La Ensenada Holding LLC Two

Law Offices of Chavez & De Leon, P.A.

Law Offices of Judith Brown Chomsky

Lemus, Nancy Mora

Leopold, Theodore J.

Marra, Hon. Kenneth A.

Molina Rivera, Nini Johana

Munoz, Gloria Eugenia

Murphy, Melissa F.

Palencia Gomez, Victor

Procesados IQF, S.A. de C.V.

Rivera Vargas, Janeth

St. James Investments, Inc.

Santa Rita Holding LLC One

Santa Rita Holding LLC Two

Scarola, John

Schonbrun Seplow Harris & Hoffman LLP

Servicios Chiquita Chile Limitada

Servicios de Logistica Chiquita, S.A.

Servicios Logisticos Chiquita, S.R.L

Sierra Soto, Mariela Isabel

Simons, Marco Benjamin

Stewart, Thomas H.

Stoolman, Michael A.

Three Sisters Holding LLC

Torres Torres, Ana Ofelia

TransFRESH Corporation

UNIPO G.V., S.A.

United Fruit Transports S.A.

United Reefer Services S.A.

Vahlsing, Marissa

Villa Correa, Luis Anibal

Villa Correa, Luz Marina

Villa Hoyos, Arelis

Villa Hoyos, Diana

Villa Maza, Leopoldo

Villa Quintero, Fabio

Villa Quintero, Norela

Wichmann, William J.

Dated:       April 11, 2025              */s/ Michael L. Cioffi*
                                         Michael L. Cioffi

## Statement Regarding Oral Argument

Although the issues raised in this appeal are straightforward and the relief requested by Appellant is clearly warranted under applicable law, Appellant requests oral argument due to the extensive factual and procedural history of this case. Oral argument will be helpful to the Court in understanding the case and arguments presented. *See* Fed. R. App. P. 34(a)(1); 11th Cir. R. 34-3(c); 11th Cir. R. 28-1(c).

# Table of Contents

Page

Certificate of Interested Persons and Corporate Disclosure Statement ................C-1

Statement Regarding Oral Argument.......................................................... i

Table of Contents ............................................................................ ii

Statement of Subject-Matter and Appellate Jurisdiction ......................... ix

Introduction .................................................................................1

Statement of the Issues.....................................................................5

Statement of the Case.......................................................................6

    I.     Factual Background...............................................................6

    II.    Plaintiffs' Claims ...............................................................10

    III.   Plaintiffs' Counsel's Witness Payment Scheme ..........................12

    IV.   Summary Judgment Rulings ..................................................18

    V.    Jury Instructions ...............................................................19

    VI.   Last Minute, Unsworn Depositions in Colombia.......................20

    VII.  Revival of the "Hazardous Activities" Claim ...........................21

    VIII. Colombia's Caps on Noneconomic Damages ..........................21

    IX.   Motion for New Trial...........................................................22

Standards of Review .......................................................................23

    I.     Summary Judgment...............................................................23

    II.    Choice of Law and Determination of Foreign Law .................23

    III.   Jury Instructions ...............................................................23

    IV.   Evidentiary Rulings .............................................................24

Summary of the Argument ....................................................................... 25

Argument ................................................................................................... 27

I.    The District Court Absolved Plaintiffs of the Burden to Prove But-
      For Causation Under Colombian Law by Applying a Watered-Down
      Aiding-and-Abetting Standard .................................................... 27

      A.    The District Court's Refusal to Apply Colombian Law to
            Colombian Law Claims Was Legal Error ........................... 27

            1.    The District Court Legally Erred When It Ignored Its
                  Obligation to Determine Colombian Law ................. 28

            2.    Plaintiffs' Colombian Law Claims Require Proof of But-For
                  Causation .................................................................. 31

            3.    Important Policy Considerations Should Prevent a District
                  Court from Ignoring Foreign Law and "Going With [Its Own]
                  Standard" ................................................................... 35

      B.    The District Court's "Aiding-and-Abetting" Standard Flouts
            Florida's Precedent ............................................................ 36

      C.    The District Court's Limitless Aiding-and-Abetting Standard
            Defies *Twitter*'s Central Requirement that a Defendant
            Consciously and Culpably Participate in the Underlying Tort as
            Something He Wished to Make Succeed .............................. 40

      D.    The Remedy Is Reversal and Judgment for Chiquita, or at
            Minimum a New Trial ......................................................... 45

II.   The District Court Committed Prejudicial Error by Submitting the
      Legally Deficient Hazardous Activities Claim Based on Instructions
      that Compounded and Further Diluted Its Erroneous Causation
      Instruction ................................................................................... 46

III.  The District Court Precluded Significant Witness Tampering
      Evidence, but Admitted Tainted Evidence and Unsworn Testimony ....... 48

      A.    The District Court Refused to Permit Cross-Examination as to
            Plaintiffs' Counsel's Improper Influence on Witnesses and the
            Bias of Those Witnesses ..................................................... 48

B.     The Unsworn and Unfairly Prejudicial Testimony of Ovidio
        Nuñez Cabrales and Carlos Bello Arrieta Warrants a New Trial .......53

IV.    At the Very Least, the Verdict Should Be Reduced to Comply with
        Colombia's Damages Caps ......................................................................57

Conclusion ......................................................................................................60

Certificate of Compliance with Type-Volume Limit, Typeface Requirements,
and Type-Style Requirements ......................................................................62

Certificate of Service ......................................................................................63

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Amazon Services LLC v. United States Dep't of Agriculture*,
  109 F.4th 573 (D.C. Cir. 2024) ............................................................41

*Animal Science Prods. v. Hebei*,
  585 U.S. 33 (2018) ................................................................................31

*Aycock v. R.J. Reynolds Tobacco Co.*,
  769 F.3d 1063 (11th Cir. 2014) ......................................................49, 51

*Banque Paribas v. Hamilton Indus. Int'l, Inc.*,
  767 F.2d 380 (7th Cir. 1985) ................................................................29

*Bhatnagar by Bhatnagar v. Surrendra Overseas Ltd.*,
  52 F.3d 1220 (3d Cir. 1995) .................................................................59

*Brink v. Direct General Ins. Co.*,
  38 F.4th 917 (11th Cir. 2022) ...............................................................45

*Broaddus v. Fla. Power Corp.*,
  145 F.3d 1283 (11th Cir. 1998) ............................................................24

*Buckner v. Fla. Habilitation Network, Inc.*,
  489 F.3d 1151 (11th Cir. 2007) ............................................................23

*Bugliotti v. Republic of Argentina*,
  952 F.3d 410 (2d Cir. 2020) .................................................................28

*Cardona v. Chiquita Brands Int'l, Inc.*,
  760 F.3d 1185 (11th Cir. 2014), *cert denied*, 575 U.S. 962 (2015) ...................11

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
  47 F.4th 1278 (11th Cir. 2022) .......................................................11, 27

*Colon v. Twitter, Inc.*,
  14 F.4th 1213 (11th Cir. 2021) ......................................................37, 38

*Drummond Co., Inc. v. Conrad & Scherer, LLP*,
  885 F.3d 1324 (11th Cir. 2018) ............................................................16

*Dupree v. Younger*,
   598 U.S. 729 (2023)..................................................................23

*Foster v. United States*,
   768 F.2d 1278 (11th Cir. 1985) .....................................58, 59

*Garcia v. Chiquita Brands Int'l, Inc.*,
   48 F.4th 1202 (11th Cir. 2022) .............................................23

*Gooding v. Univ. Hosp. Bldg., Inc.*,
   445 So.2d 1015 (Fla. 1984) .........................................38, 39

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983)......................................42, 43

*Hamm v. Powell*,
   874 F.2d 766 (11th Cir. 1989), *on reh'g in part,* 893 F.2d 293
   (11th Cir. 1990)........................................................................47

*Jessner v. Arab Bank, PLC*,
   138 S. Ct. 1386 (2018)...........................................................36

*Lesti v. Wells Fargo Bank N.A.*,
   960 F. Supp. 2d 1311(M.D. Fla. 2013)..................................37

*McDaniel v. Petroleum Helicopters, Inc.*,
   455 F.2d 137 (5th Cir. 1972) .................................................58

*McNely v. Ocala Star-Banner Corp.*,
   99 F.3d 1068 (11th Cir. 1996) ..............................................23

*Pate v. Seaboard R.R., Inc.*,
   819 F.2d 1074 (11th Cir. 1987) .............................................46

*Peat, Inc. v. Vanguard Research, Inc.*,
   378 F.3d 1154 (11th Cir. 2004) .............................................24

*Piamba Cortes v. American Airlines, Inc.*,
   177 F.3d 1272 (11th Cir. 1999) .....................................58, 59

*Rand v. Nat'l Fin. Ins. Co.*,
   304 F.3d 1049 (11th Cir. 2002) .............................................23

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
    818 F.3d 1320 (Fed. Cir. 2016) ............................................................53

*Riley v. Tesla, Inc.*,
    No. 22-12515, 2025 WL 881387 (11th Cir. Mar. 21, 2025) ......................38, 39

*Rothstein v. Carriere*,
    373 F.3d 275 (2d Cir. 2004) ................................................................45

*SEC v. Dunlap*,
    253 F.3d 768 (4th Cir. 2001) ...............................................................29

*Simmons v. Bradshaw*,
    879 F.3d 1157 (11th Cir. 2018) ............................................................24

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)...........................................................................35

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)...................................................................*passim*

*Twohy v. First National Bank of Chicago*,
    758 F.2d 1185 (7th Cir. 1985) .............................................................30

*Ty Inc. v. Softbelly's Inc.*,
    353 F.3d 528 (7th Cir. 2003) ...............................................................53

*United States v. Alvarez*,
    837 F.2d 1024 (11th Cir. 1988), *cert. denied*, 486 U.S. 1026 (1988) ...............53

*United States v. Calle*,
    822 F.2d 1016 (11th Cir. 1987) ............................................................57

*United States v. Davis*,
    261 F.3d 1 (1st Cir. 2001)....................................................................50

*United States v. Fowler*,
    605 F.2d 181 (5th Cir. 1979) ...............................................................53

*United States v. Oudovenko*,
    No. 00-cr-1014, 2001 WL 253027 (E.D.N.Y. Mar. 7, 2001)............................54

*United States v. White*,
 2023 WL 9016456 (11th Cir. Dec. 29, 2023)......................................................41

*United States v. Winkle*,
 587 F.2d 705 (5th Cir. 1979) ...............................................................................57

*Universe Sales Co. v. Silver Castle, Ltd.*,
 182 F.3d 1036 (9th Cir. 1999) ...........................................................28, 29, 45

*Ward v. Nierlich*,
 No. 99-14227 CIV, 2006 WL 5412626 (S.D. Fla. Sept. 18, 2006)...................50

*Yavuz v. 61 MM, Ltd.*,
 465 F.3d 418 (10th Cir. 2006) ...........................................................................30

## Other Authorities

Fed. R. Evid. 403 ...............................................................................49, 51

Fed. R. Evid. 603 ...........................................................................................53

## Statement of Subject-Matter and Appellate Jurisdiction

The district court had subject-matter jurisdiction over the Plaintiffs' claims under 28 U.S.C. § 1332. On October 18, 2024, the district court entered partial final judgment on the Plaintiffs' claims under Federal Rule of Civil Procedure 54(b). Vol65App14914–14916. Chiquita timely appealed on November 16, 2024. Vol66App14976–14982. Chiquita subsequently amended its notice of appeal on January 13, 2025, following the district court's resolution of all pending post-trial motions. Vol66App15077–15086. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## Introduction

Between 1990 and 2004, Colombia was ravaged by relentless violence caused by narcoterrorist groups during Colombia's long and bloody drug war, a conflict that claimed hundreds of thousands of lives. These factions—sometimes posing as left-wing guerrillas and right-wing paramilitaries—viciously attacked civilians and businesses alike, using fear, extortion, and brutality to grow their drug empires. Chiquita Brands International, Inc. ("Chiquita") has always condemned the senseless violence and suffering the narcoterrorists inflicted during this dark time in Colombian history.

During this conflict, Chiquita was repeatedly extorted into making "protection" payments. Chiquita paid, fearing for the lives of its employees. Other businesses paid, too. And though Chiquita could have abandoned its employees to the chaos, it stayed, investing in Colombian infrastructure, supporting the local economy, and paying its employees high wages.

Years after the conflict ended, thousands of Plaintiffs sued the company alleging that the extortion payments enabled narcoterrorists to perpetuate violence and kill their relatives. To be clear, Plaintiffs do not argue that Chiquita participated in or even knew about these killings. They contend that Chiquita's payments to one of the narcoterrorist groups, Autodefensas Unidad de Colombia ("AUC")—which amounted to less than 0.04% of the AUC's annual cocaine profits—make Chiquita

legally responsible for every person the AUC killed during this war. But there is no evidence tying Chiquita's payments to any of the decedents' deaths. One of the reasons the jury returned a verdict in Plaintiffs' favor was the court's erroneous instruction that the jury could find Chiquita liable as long as Chiquita "understood the mission of the organization" when it made the extortion payments, and the "cash payments or other means of support" were "sufficient to create a foreseeable risk of harm to others, including that Plaintiff's relative."

That watered-down causation standard was wrong several times over. For starters, the court refused to apply Colombia's "but-for" causation requirement in wrongful death negligence cases, despite holding that Colombian law governs Plaintiffs' claims. Instead, the court purported to apply Florida's aiding-and-abetting common law. That was legal error. District courts are obligated to ascertain and apply foreign law to foreign claims; courts may not simply substitute domestic law out of convenience. And the court was wrong even on its own terms: Just like Colombia, Florida requires plaintiffs to prove but-for causation in wrongful death cases, even in cases involving multiple tortfeasors. Finally, even if some version of aiding-and-abetting liability applied, it would be nothing like the limitless liability the court proposed to the jury. As the Supreme Court recently held in *Twitter, Inc. v. Taamneh*, plaintiffs must prove that "the defendant consciously and culpably participated in [the] wrongful act as something they wished to bring about, or sought by their actions

to make it succeed"; it is not enough to show mere "assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." 598 U.S. 471, 493, 495 (2023). But that is precisely what the court permitted here when it said Plaintiffs needed merely to prove that Chiquita knew of the narcoterrorists' "mission" and that such "support" increased the risk of terrorist acts and the "probability" that Plaintiffs' relatives would be a victim. This Court should reverse.

The district court committed several other errors requiring reversal. Compounding the prejudicial error in its negligence instruction, the court permitted Plaintiffs to resurrect a legally deficient "hazardous activities" claim on the eve of trial and submitted that claim to the jury. The court watered down the negligence standard to an even lower threshold, telling the jury that Chiquita could be held liable if "support to the AUC was an activity that increased the risk to members of the community beyond those to which members of the community are normally exposed." This exacerbated the error in the court's negligence causation instruction by further obliterating the nexus required by *Twitter*, between wrongful conduct and the tort alleged in the complaints. The fact that the court eventually dismissed the hazardous activity claim on Chiquita's Rule 50 motion in no way cured the prejudicial harm to Chiquita because the jury's deliberation over the hazardous

activity instruction inevitably affected and led to its conclusion that Chiquita was liable under the erroneous negligence causation standard.

The trial was further compromised by the admission of tainted and unsworn witness testimony. According to one of the Plaintiffs' lawyers, some of this tainted evidence was procured through "one of this country's largest law firm witness bribery scandals in history." Yet the court summarily dismissed the evidence of the witness tampering and barred Chiquita from cross-examining witnesses and submitting other documents to show the evidence was tainted.

Finally, the court disregarded Colombian damages caps, awarding damages *forty times greater* than what Colombian law permits.

The Court should reverse and direct the district court to enter judgment in Chiquita's favor or order a new trial.

## Statement of the Issues

1.      Whether the court legally erred by failing to apply Colombia's but-for causation standard to Plaintiffs' Colombian wrongful death negligence claims and instead applying a watered-down, aiding-and-abetting standard that defies Florida and U.S. Supreme Court precedent.

2.      Whether the court erred by permitting a legally deficient hazardous activities claim to go to the jury and giving an instruction that further diluted the erroneous negligence instruction it also gave the jury.

3.      Whether the district court committed fatal evidentiary errors when it rejected Chiquita's evidence of witness tampering, and admitted unsworn and highly prejudicial testimony from suspect witnesses.

4.      Whether the court erred by failing to reduce the verdict as required by Colombia's cap on damages.

**Statement of the Case**

## I.    Factual Background

Chiquita sources and sells fruit all over the world. Vol50App11306:21–11308:6. In the 1980s and 90s, Chiquita owned and operated banana farms in Colombia through its subsidiary C.I. Bananos de Exportacion, S.A. ("Banadex"). Vol41App9387:7–10. During this time, a bloody drug war in Colombia intensified, and warring factions of narcoterrorists trapped businesses in the middle of the chaos, threatening to raze their properties and kill their employees unless they made extortion payments. Vol47App10626:24–10630:22; Vol48App10875:2–10881:6. More than 300,000 Colombians were murdered between 1990 and the early 2000s during this drug war. Vol55App12548:22–12549:19. And Colombian businesses capitulated to the extortionists' demands. Vol47App10630:1–22.

The Fuerzas Armadas de Revolucionarias de Colombia ("FARC"), one of the narcoterrorist groups, began extorting payments from Chiquita in 1989. Vol48App10875:2–13. In 1995, the FARC stopped a bus of Chiquita workers and murdered twenty-five employees. Vol62App14153–14156 (27:09–32:02). Instead of abandoning its workforce, Chiquita remained in Colombia, and continued to pay its employees high wages and provide opportunities to the local population. *See* Vol48App10885:5–19; Vol62App14144 (13:22–14:09).

Chiquita sought help from the Colombian military and police, but they were unable to help. Vol48App10885:20–10887:1. The police was an "insignificant force compared to the guerilla groups." Vol48App10885:20–10886:20. The military told Chiquita that it was unable to adequately protect Chiquita from violence. *Id.*

Consequently, Chiquita, like other businesses, paid the extortion payments rather than risk the lives of its employees. Vol50App11315:14–11317:7; Vol62App14160–14161 (36:21–37:25); *see also* Vol48App10884:4–12; Vol53App12061:16–12066:1; Vol62App14163(51:10–14). It made this decision after receiving outside legal advice. Vol53App12069:7–12072:2, 12097:4–13. Chiquita consulted a prominent law firm, Baker & McKenzie, which assured Chiquita that the payments were legal under Colombian law. *Id.* Chiquita also consulted with and followed the advice of the leading outside global security firm, Control Risks, in making the payments. Vol48App10877:14–10878:9; 10887:9–13.

In 1997, the drug kingpins that ousted Pablo Escobar formed a new warring narcoterrorist group, the AUC. Vol54App12388:2–12389:2. From 1997 to 2004, the AUC fought the FARC over drug routes in Colombia and trafficked half a billion dollars' worth of cocaine per year to the United States alone. *See* Vol54App12341:24–12342:20; Vol54App12350:1–5. The AUC's large-scale narcotics trafficking drove growth in its troop numbers and its violence along known drug routes. Vol55App12612:3–12616:8. Like other groups, the AUC extorted local

7

businesses. Vol43App9842:19–21; Vol45App10218:7–11; Vol46App10438:19–10440:9; Vol47App10648:2–25; Vol62App14131–14133(58:22–63:14).

In 1997, the AUC's head, Carlos Castaño, summoned Banadex's then-general manager, Charles Keiser, and ordered Banadex to stop paying the FARC and pay the AUC instead. Vol51App11660:19–11665:9, 11672:5–9. AUC commander Raul Hasbún, who was also at the meeting, confirmed that if Banadex did not pay, it would become a "military target of the AUC." Vol62App14132–14133(62:21–63:14). The U.S. government also acknowledged that during this meeting "Castaño sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property." Vol62App14172 ¶21. Chiquita refused to abandon its employees. *See* Vol56App12887:7–16.

From 1997 to 2004, Chiquita paid on average $212,500 in extortion payments to the AUC per year,[1] which amounted to less than 0.04%[2] of the AUC's annual cocaine revenues alone. Outside counsel advised Chiquita that the payments to the AUC were legal under Colombian law, just like the FARC payments were. Vol53App12094:14–12097:13, 12069:7–12072:2, 12097:4–13. And as when it

---

[1] Chiquita paid roughly $1.7 million between 1997 and 2004 ($1,700,000/8 years). *See* Vol62App14171 ¶ 19.

[2] For just the Cordoba region of Colombia alone, the AUC generated roughly $528 million per year in cocaine revenue ($22,000/kilo x 24,000 kilos/year). *See* Vol54App12342:16–20 (average wholesale price per kilo of cocaine was $22,000); Vol54App12350:1–12 (AUC trafficked 24,000 kilos of cocaine per year for the Cordoba region).

made the FARC payments, Chiquita feared that employees would be at serious risk if the payments were not made. *See e.g.*, Vol49App11100:9–17; Vol56App12724:13–18 ("The conclusion was that if we ceased the payments, people would die."); Vol53App12084:3–12087:14.

On September 10, 2001, the United States designated the AUC a foreign terrorist organization. Vol53App12118:6–16. Although that decision was reported in some media on September 11, 2001, Chiquita did not learn of it until February 2003. Vol53App12118:17–12119:25. Upon learning of the designation, Chiquita suspended the payments and consulted its outside counsel, Kirkland & Ellis. Vol53App12120:1–8. Chiquita then self-reported the payments to the United States Department of Justice ("DOJ"). Vol53App12123:21–12124:14. Chiquita told the DOJ that the "payments were absolutely necessary" and stopping the payments may "allow people to be killed." Vol53App12127:16–12128:3. Chiquita also explained that "every company in the banana business" and "other agricultural companies" were "making these payments to the AUC and [were] being extorted." Vol53App12126:18–12127:15.

Chiquita fully cooperated with the DOJ. Vol53App12130:11–12131:13. And, the DOJ "complimented the company for doing the right thing by coming forward" and acknowledged Chiquita's "terribly difficult situation." Vol53App12134:5–12136:24; Vol53App12128:9–12. The DOJ told Chiquita that "the matter of

9

continued payments in the future was complicated," but it did not instruct Chiquita to stop the extortion payments. Vol53App12130:4–10.

Hearing no directive from the government, Chiquita restarted the payments to protect the lives of its workers. Vol53App12132:18–12133:25; Vol49App11152:9–11153:15. Chiquita told the government that it had resumed the payments. Vol53App12139:3–23.

Chiquita made its final payment to the AUC on January 24, 2004, and then sold its operation in Colombia. Vol48App10932:9–25; Vol53App12143:2–6; Vol62App14188. The deal included a long-term supply agreement to ensure the livelihoods of Chiquita's workers. Vol56App12749:21–12750:10. Almost three years later, the DOJ and Chiquita entered into a plea agreement, through which Chiquita agreed to pay a $25 million fine and plead guilty to the technical violation of transacting with the AUC without first obtaining a license from the Department of Treasury. Vol54App12297:5–12298:8; Vol41App9366:3–6.

## II.    Plaintiffs' Claims

After Chiquita's fine became public, thousands of plaintiffs sued Chiquita, alleging it was liable for damages arising from killings committed by unknown perpetrators who were supposedly AUC members. *See generally* Vol3App672–Vol5App1064; Vol6App1192–Vol13App2929. The actions were ultimately centralized and transferred to the Southern District of Florida before Judge Kenneth

A. Marra in the MDL captioned *In re Chiquita Brands International, Inc. Alien Tort Statute and Shareholders Derivative Litigation*, No. 08-01916-MD.

Plaintiffs asserted claims against Chiquita under U.S. federal and state law and under Colombian law. Vol5App1066. The district court dismissed the state-law claims on extraterritoriality grounds, Vol5App1150, and dismissed the federal claims. *See Cardona v. Chiquita Brands Int'l, Inc.*, 760 F.3d 1185 (11th Cir. 2014), *cert denied*, 575 U.S. 962 (2015). As a result, the only claims left against Chiquita were "those brought under Colombian law." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1295 n.3 (11th Cir. 2022); *see also* Vol14App3095–3096 (district court finding that Colombian law, not U.S. law, applies to Plaintiffs' Colombian law claims).

This appeal concerns ten cases that were consolidated, over Chiquita's objection, into a single jury trial conducted between April 24, 2024 and June 10, 2024. Vol23App5102–5117. Plaintiffs are family members of ten decedents: Evaristo Antonio Durango de Andres,[3] Carlos Arturo Palencia Sabaja, Albeiro Antonio Molina Roman, Miguel Antonio Cardona Munoz, Waynesty Machado

---

[3] On May 12, 2024, Plaintiff Elvia Gomez Urrego voluntarily dismissed her claims with prejudice, removing decedent Evaristo Antonio Durango de Andres's case from the trial. Vol44App10075.

Durango,[4] Ceferino Antonio Restrepo Tangarife, Libardo de Jesus Villa Mora, Francisco de Jesus Jinete Sierra, Franklin Fabio Fontalvo Salas, and Miguel Antonio Rodriguez Duarte. Plaintiffs could not identify the people who killed their decedents. Vol46App10425:1–8. There is no evidence that Chiquita was involved in, intended, or was even aware of the deaths of any of the Plaintiffs' decedents. There is no evidence that any money paid to the AUC by Chiquita was linked to any of the Plaintiffs' decedents' deaths.

## III.    Plaintiffs' Counsel's Witness Payment Scheme

Discovery revealed that Plaintiffs' lawyers, most prominently Terrance Collingsworth from Conrad & Scherer ("C&S"), promised to pay or actually paid AUC commanders Raul Hasbún (alias "Pedro Bonito") and José Lugo Mangones (alias "Carlos Tijeras") in exchange for favorable testimony. Vol30–35App6857–7977; Vol40App9031–9042; Vol59App13425–13544; Vol61App13838–13850. This evidence was essential, as nearly all of the Plaintiffs relied on testimony by Hasbún and Mangones to prove their claims' threshold element of AUC involvement. Vol59App13597:2–13598:6;    Vol60App13634:7–13636:9;    Vol59App13589:2–13590:3; Vol59App13591:10–18; Vol59App13592:20–22; Vol60App13608:22–13610:10; Vol60App13624:3–9.

---

[4] The jury returned a verdict in favor of Chiquita on Plaintiff Pastora Durango's claim concerning the death of Waynesty Machado Durango. Vol65App14915. Chiquita does not appeal the jury's verdict on this claim.

As another Plaintiffs' attorney (and former C&S partner), William Wichmann, later told a Florida state court, this was "one of this country's largest law firm witness bribery scandals in history." Vol31App7031:15–16. Collingsworth and C&S "conspired to perpetuate, and in fact perpetuated a scheme to manufacture, file and maintain frivolous cases against U.S. corporations including Drummond and Dole and others, for actions overseas," Wichmann explained in a signed pleading. Vol61App13922. That scheme involved "illegal acts, including but not limited to witness bribery, suborning perjury, and money laundering." *Id.*

For example, C&S paid prospective witnesses "to influence [their] testimony in cases the law firm was preparing and filing against U.S. companies" and "paid hundreds of thousands of dollars to criminals, admitted terrorists, and murderers imprisoned in Colombia." Vol61App13923. Wichmann explained that C&S "agreed to pay the lawyer for these admitted terrorists and murderers a contingent fee, as an inducement to procure and influence testimony from witnesses to manufacture frivolous and fraudulent lawsuits." *Id.*

Collingsworth and C&S also conspired to manipulate Colombia's "Justice and Peace" proceedings, in which AUC commanders testified that they were responsible for thousands of killings that occurred in regions they controlled. Vol59App13470; Vol46App10410:15–10412:18. The two AUC commanders relevant to this case are Raul Hasbún and José Mangones, who Plaintiffs contend admitted responsibility for

the deaths of most of Plaintiffs' decedents. *See* Vol46App10414:24–10415:10. As the AUC began to demobilize, the Colombian legislature created the Justice and Peace proceedings as a way to give recognition to the thousands of victims of the Colombian armed conflict and incentivize AUC members to demobilize voluntarily. Vol55App12563:19–12567:15, 12568:15–22, 12574:15–12575:15. Through this process, AUC commanders received a five to eight year sentence (as opposed to an ordinary homicide sentence ranging 40–60 years) so long as they provided a "general acceptance" of responsibility for crimes and murders that occurred within regions that they controlled. *Id*. This resulted in an admission of responsibility for crimes committed in the areas they controlled, even if the AUC commanders had no knowledge of the victims or the actual crimes. *See id*; *see also* Vol62App14126 (40:23–41:08).

According to Wichmann, Collingsworth and C&S would give "'scripts' (questions and answers) to imprisoned terrorist witnesses prior to sworn testimony, as improper inducements to influence their testimony in a scheme to manufacture, create and file fraudulent cases." Vol61App13927. Wichmann admitted that Collingsworth gave a "script" to Mangones prior to his Justice and Peace proceedings "so that he could testify and give facts necessary for [C&S] to bring this lawsuit that they brought against Dole and also Chiquita and also Drummond." Vol31App7044:9–20. Another Plaintiffs' attorney, Paul Wolf, also informed the

court of the "Mangones Script," which he described as a document outlining what Mangones was "supposed to say." *See* Vol35App7934. Wolf agreed that this "Mangones Script" completely contradicted Mangones' prior declarations. *Id.*[5]

Documents corroborate Wichmann's admissions. Vol59App13449; 13470. There is the Mangones Script itself. Vol59App13470. Collingsworth's emails document Mangones—labeled "CT" for Carlos Tijeras—demanding "another 10" thousand dollars from Collingsworth. Vol59App13437–13438. Collingsworth received emails from his associates stating that "[Mangones] is very pissed" and "liable not to say what we want, or worse." Vol59App13439. Collingsworth's associate told him that Mangones "has his final hearing" in the Justice and Peace proceedings and that "it is very important that you know this in the event there are things that you want to add that he has yet to testify to." Vol59App13475.

Collingsworth's emails also reflect offers of payment to Hasbún, clarifying that any payments would be contingent on the outcome of Collingsworth's cases. *See e.g.*, Vol59App13519 ("I am meeting the AUC's treasurer [Hasbún] in Medellin August 15. I need to bring our first good faith payment of 10k. We will sign an agreement with the lawyers, a very simple one for reasons I would rather explain by phone."); *see also* Vol59App13478 (Collingsworth coordinating with Hasbún's

---

[5] Wolf split from the rest of the Plaintiffs' counsel over this conduct and asked the court to refer the matter to the U.S. Attorney's Office, but the court never responded to this request. *See, e.g.*, Vol29App6594:6-9.

lawyers to "encourage [Hasbún] to cooperate with us discreetly" and use code names).

Collingsworth even admitted to tampering with Hasbún in a sworn deposition. [6] *See* Vol33App7399(559:23–560:6) ("Q. In Chiquita, did you offer to pay an up-front payment and a contingency fee to the lawyer of any witness in exchange for information from that witness? A. Well . . . we attempted to do that with Raul Hasbún and his -- his advisor, Harley [*sic*]."). Collingsworth worked with Hasbún's other lawyer, Joaquin Perez, who "made an offer of $50,000" in exchange for Hasbún's involvement in creating "lists of victims" of AUC violence for this case. Vol32App7202(134:2–135:18). During negotiations, Hasbún was "unwavering in his demands" and required a "serious deal" of at least $250,000. Vol59App13483; 13523. In this case, Hasbún himself also testified that he was offered $3–5 million if Plaintiffs were to win this case. Vol62App14134–14135(75:22–79:09).

---

[6] Collingsworth's scheme has been the subject of RICO and defamation claims against Collingsworth and C&S, brought by Drummond Co., Inc. in the Northern District of Alabama. *Drummond Co., Inc. v. Collingsworth*, 2:15-CV-506-RDP; 2:11-cv-3695-RDP. There, the district court found that "[o]n multiple occasions, Collingsworth lied about having made these payments, including . . . in multiple declarations filed with the court." Vol66App15063. The court also found there was evidence that "Defendants made a series of payments to seven witnesses or their families." Vol66App15041. Indeed, this Court affirmed application of the crime-fraud exception to allow Drummond to obtain Collingsworth's documents. *See Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1330–31 (11th Cir. 2018).

16

Despite all this evidence, the court did not make any inquiry of Collingsworth, Wichmann, or C&S. Further, the court prohibited Chiquita from calling any Plaintiffs' counsel at trial to testify about the witness tampering to attack the credibility of Hasbún's and Mangones' purported confessions of responsibility at Justice and Peace. Vol38App8665–8667. Nor did the court permit Chiquita to admit the documentary evidence showing the witness tampering, permitting Chiquita to proffer it into the record for appeal purposes only. Vol40App8999:6–9000:18; Vol57App12928:3–10.

On the flip side, the court admitted much of the tainted evidence from the Colombian Justice and Peace proceedings. Vol44App9938:17–9955:10; Vol45App10353:2–10354:9. The court also allowed Plaintiffs' expert witness, Oliver Kaplan, to testify over Chiquita's objections that the Justice and Peace proceedings were "reliable," and that the AUC commanders' confessions were "truthful" and "verifi[ed]" by the Colombian Attorney General's office. Vol46App10410:15–10414:13; *see also* Vol46App10414:21–10415:16. Kaplan concluded that "it is highly likely and more likely than not, that all of the murders in this case were committed by the AUC." Vol46App10417:19–24. The district court prevented Chiquita from cross-examining Kaplan regarding the effect Collingsworth's tampering had on the reliability of the Justice and Peace process and the truthfulness of the confessions, despite Collingsworth's interactions with

17

Mangones and Hasbún having occurred in the midst of their purported confessions at Justice and Peace.

## IV.   Summary Judgment Rulings

Chiquita moved for summary judgment arguing that Plaintiffs could not satisfy the but-for causation standard applicable under Colombian law, among other things. Both parties submitted detailed expert reports explaining Colombian causation standards, including on-point Colombian Supreme Court jurisprudence. Vol16App3549–3597; Vol17–18App3889–3985. The parties' experts, both former Justices of the Colombian Supreme Court, agreed as to the key issue—that Colombian law required proof of but-for causation. *See* Vol16App3557–3558; Vol17App3910–3911 n.39.[7]

The court rejected both declarations, concluding that the parties did not provide a sufficient explanation of Colombia's causation standards in the secondary-tortfeasor context. *See* Vol19App4371–4375.[8] The court did not ask any relevant

---

[7] Plaintiffs also submitted the declaration of Paula C. Arias, an attorney licensed in Colombia and Florida. Vol17App3817. Arias purportedly departed from Plaintiffs' expert, Justice Arrubla, and stated in conclusory fashion that Colombian law does not require but-for causation or "causation in fact" and rather, Colombian law is consistent with the "substantial factor" test that the district court applied in a prior Anti-Terrorism Act ("ATA") case. Vol17App3826–3827. Arias cites no Colombian authority for either proposition. *Id.*

[8] The court ruled on summary judgment in DE 3238(Vol19–20App4296–4400) and DE 3239(Vol20App4401–4419). Although DE 3239 pertains to the Plaintiffs in this appeal, the court incorporated its analysis from DE 3238 into DE 3239. Vol20App4415.

questions at oral argument, request supplemental briefing, or make any further effort to clarify or determine the Colombian causation standard applicable to Plaintiffs' claim. *Id.* Instead, the court *sua sponte* concluded that it could apply *Florida's* causation law. Vol19App4373–4374. The court then presumed that Florida courts apply the federal aiding-and-abetting standards in wrongful death cases without citing any Florida cases on point.

The court denied Chiquita's motion for summary judgment. Vol19App4375. After this decision, the Supreme Court issued *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), which made clear that the court's articulation of federal common law was incorrect. Chiquita moved for reconsideration, but the court summarily denied that motion. Vol20App4531–4593; Vol23App5118–5121.

## V.    Jury Instructions

To address the court's perceived lack of information as to Colombian law, both parties submitted supplemental declarations from Colombian law experts addressing causation in the secondary tortfeasor context. Vol25App5565–5578; Vol25App5692–5735. Chiquita's expert, former Colombian Supreme Court Justice Santos, confirmed that Colombian law applies the same but-for causation test in the secondary tortfeasor context. Vol25App5696–5697, 5700–5704.

The court flat-out refused to consider these declarations. Vol39App8844:23–8845:9. As the court put it: "I haven't focused on [the supplemental submissions,] to

19

be honest, because I thought I was going with my standard throughout the case." Vol57App13134:14–13135:7. The court, therefore, refused "to adopt a new standard or different standard" based on Chiquita's supplemental filings and instead applied the same standard it used at summary judgment. *See* Vol61App13867–13868.

The court also rejected Chiquita's proposed causation instruction under Colombian law as well as Chiquita's alternative instructions under Florida and federal common law (Vol38App8744–8777), applying instead the standard it articulated at summary judgment. *See* Vol61App13867–13868.

## VI.   Last Minute, Unsworn Depositions in Colombia

Mere weeks before trial, the court allowed Plaintiffs to take "trial depositions" of never-before-deposed witnesses in Colombia, despite discovery having closed more than five years prior. Vol24App5404. Two of those witnesses—Ovidio Nuñez Cabrales and Carlos Bello Arrieta—were deposed without a proper oath or enforceable penalty for perjury. Vol36App8294–8297. Chiquita moved to exclude their uncorroborated and sensational testimony, but the court permitted the testimony to be played at trial. Vol38App8657–8661. Chiquita moved for mistrials following both witnesses' testimony, but the court summarily denied both motions. Vol43App9695:2–9699:25; Vol43App9857:18–9858:13.

## VII.  Revival of the "Hazardous Activities" Claim

In 2022, the district court ruled that "the case will go forward on the negligence style (and subsumed wrongful death style) Colombian law claims only." Vol20App4391; Vol20App4418. About two weeks before trial, the court unexpectedly revived Plaintiffs' "hazardous activities" strict liability claim, allowing the claim to go to the jury. Vol36App8292–93. At trial, the court instructed the jury that Chiquita could be liable for "activity that increased the risk to members of the community beyond those to which members of the community are normally exposed." Vol61App13871. At the close of evidence, Chiquita moved for judgment as a matter of law, but the court deferred ruling until after a verdict. Vol57App13082–13090. After trial, Chiquita renewed its Rule 50 motion on Plaintiffs' hazardous activities claim (Vol62App14203–14212), which the court granted. Vol65App14899–14908. The court's ruling did not cure the prejudice to Chiquita, as the hazardous activities instructions further diluted the erroneous causation instruction from the negligence claim.

## VIII.  Colombia's Caps on Noneconomic Damages

Prior to trial, Chiquita moved for an order precluding Plaintiffs from recovering damages that exceed the caps Colombian law places on noneconomic damages awards. Vol22App5068–5069. The court deferred ruling until after trial. Vol35App7983. Following deliberations, the jury found Chiquita liable for deaths of

21

eight of the nine decedents and awarded $38.3 million in damages. Vol61App13881–13888.

Chiquita moved to reduce the verdict amount in accordance with Colombia's caps on noneconomic damages. Vol62–65App14215–14898. The court did not consider the parties' post-trial briefing and denied Chiquita's motion. Vol65App14909–14913.

## IX.    Motion for New Trial

Following the court's post-trial rulings, the court entered partial final judgment on the Plaintiffs' claims under Rule 54(b). Vol65App14914–14916. Chiquita moved for a new trial and for relief from judgment (Vol65App14917–14938), which the court summarily denied on December 30, 2024. Vol66App15075.

## Standards of Review

### I.    Summary Judgment

This Court reviews a district court's order on a motion for summary judgment *de novo*. *Buckner v. Fla. Habilitation Network, Inc.*, 489 F.3d 1151, 1154 (11th Cir. 2007). The Court can correct a legal error at summary judgment even after a trial. *Dupree v. Younger*, 598 U.S. 729, 735–38 (2023).

### II.    Choice of Law and Determination of Foreign Law

This Court reviews both the district court's choice of law rulings and its determinations of foreign law *de novo*. *Garcia v. Chiquita Brands Int'l, Inc.*, 48 F.4th 1202, 1209 (11th Cir. 2022).

### III.    Jury Instructions

"On appeal, [this Court] examine[s] whether the jury instructions and verdict form, considered as a whole, were sufficient so that the jurors understood the issues and were not misled." *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1072 (11th Cir. 1996) (reversing and remanding for new trial due to erroneous causation jury instruction) (quotations omitted).

The Court reviews whether the jury instructions and verdict form "accurately reflect the law . . . *de novo*, as with any other question of law." *Id.* (citations omitted); *see also Rand v. Nat'l Fin. Ins. Co.*, 304 F.3d 1049, 1051–52 (11th Cir. 2002).

If this Court is "left with a substantial and ineradicable doubt as to whether

the jury was properly guided in its deliberations," then this Court "will reverse and order a new trial." *Simmons v. Bradshaw*, 879 F.3d 1157, 1162 (11th Cir. 2018) (citations omitted) (ordering new trial where jury "instructions [did] not accurately reflect the law"); *Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1288 (11th Cir. 1998) (same).

## IV.    Evidentiary Rulings

Evidentiary errors are reviewed for abuse of discretion, which occurs when the district court makes "a clear error of judgment" or "applie[s] an incorrect legal standard." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004). Evidentiary errors warrant a new trial where they "affect[ed] the party's 'substantial rights' or resulted in 'substantial injustice.'" *Id.* at 1162 (internal citations omitted).

## Summary of the Argument

From summary judgment to post-judgment motions, the district court committed multiple fundamental errors that warrant vacating and entering judgment in favor of Chiquita or remanding for a new trial.

First, the district court erred by refusing to apply the but-for causation standard required for a Colombian law negligence claim. Instead, the court devised its own standard from a misinterpretation of Florida and federal common law.

Second, the court erred by including a legally deficient hazardous activities claim and giving an instruction to the jury that compounded the prejudice of the erroneous causation instruction. The hazardous activities instruction diluted the negligence causation instruction to the point that Chiquita could be held liable if its activity "increased the risk to members of the community beyond those to which members of the community are normally exposed."

Third, the court refused to admit evidence that key witnesses had been offered money in exchange for favorable testimony pertaining to this case. The court also barred cross-examination on this issue. At the same time, the court admitted untimely, unsworn, and highly prejudicial testimony from suspect witnesses.

Lastly, the court erroneously refused to apply Colombian law's caps on non-economic damages, resulting in an excessive verdict.

25

For these reasons, this Court should vacate and enter judgment in favor of Chiquita or otherwise remand for a new trial. At a minimum, this Court should reduce the damages award as required by Colombian law.

**Argument**

## I.    The District Court Absolved Plaintiffs of the Burden to Prove But-For Causation Under Colombian Law by Applying a Watered-Down Aiding-and-Abetting Standard

### A.    The District Court's Refusal to Apply Colombian Law to Colombian Law Claims Was Legal Error

It is undisputed that Colombian law applies to Plaintiffs' Colombian wrongful death negligence claim. *See, e.g.*, Vol20App4391 (reaffirming, consistent with prior rulings, that Colombian law applies to Plaintiffs' wrongful death negligence claims); *Carrizosa*, 47 F.4th at 1295 n.3 ("With respect to Chiquita, the only bellwether claims left are those brought under Colombian law."). And yet the district court refused to apply Colombian law. That was legal, reversible error. Instead, the court looked to Florida law. Had the court properly looked to Florida's wrongful death negligence jurisprudence, it would have applied Florida's but-for causation requirement.  Instead, the court looked to Florida law for a different cause of action, aiding-and-abetting liability.  But the aiding-and-abetting standard the court fashioned disregarded Florida's requirement that an aider and abettor have actual knowledge of the underlying tort. And, the court's aiding-and-abetting standard flouted federal common law by ignoring the guardrails the U.S. Supreme Court recently set forth in *Twitter*.

These fundamental errors led to an erroneous summary judgment decision, jury instructions riddled with error, and an indefensible verdict in favor of the

Plaintiffs at trial. This Court should reverse and direct the district court to enter summary judgment in Chiquita's favor. At a minimum, the Court should order a new trial with jury instructions that correctly reflect Colombian law.

### 1.    The District Court Legally Erred When It Ignored Its Obligation to Determine Colombian Law

District courts must determine what foreign law applies to the case, and courts of appeals do not hesitate to reverse when district courts abandon that obligation. In *Bugliotti v. Republic of Argentina*, 952 F.3d 410, 414 (2d Cir. 2020), the Second Circuit reversed the district court and remanded with instructions to consider and determine Argentine law, noting that even "[i]n the absence of an authoritative answer to a foreign legal question . . . a district court's obligation to reach an independent determination remains." In *Universe Sales Co. v. Silver Castle, Ltd.*, the Ninth Circuit reversed the denial of summary judgment and instead granted a cross-motion for summary judgment where the "district court did not do an adequate job in its effort to ascertain the relevant law." 182 F.3d 1036, 1039 (9th Cir. 1999). The district court in *Universe Sales* ignored a party's Rule 44.1 declaration (even more egregiously, the district court here ignored both parties' expert reports provided at trial), "performed no independent research," and ultimately failed to do "anything close to [a] careful and extensive analysis" of foreign law. *Id.* at 1038–39. Also, like here, the court "never strayed" from its original reasoning and earlier rulings on applicable law despite receiving subsequent Rule 44.1 declarations. *Id.* at 1039 &

n.2. The Ninth Circuit did not hesitate to reverse, stating: "it is not novel for an appellate court in this context to determine that a district court performed an inadequate inquiry." *Id.* at 1039; *see also Banque Paribas v. Hamilton Indus. Int'l, Inc.*, 767 F.2d 380, 385–86 (7th Cir. 1985) (reversing summary judgment and remanding for determination of Saudi Arabian law, as district court was not entitled to reject party's expert "when no contrary evidence had been introduced, or independent research into Saudi law conducted by [the court]"); *SEC v. Dunlap*, 253 F.3d 768, 777 (4th Cir. 2001) (remanding with instructions to determine "what Costa Rican law actually provides, and its significance").

Here, the court refused to determine the applicable causation standard under Colombian law despite receiving substantial Rule 44.1 submissions from both parties, which were consistent that but-for causation applies to Plaintiffs' claims. The court justified its failure to ascertain Colombian law by relying on inapposite cases where the parties submitted no evidence of foreign law, or where the applicability of foreign law was disputed and forum law controlled the U.S. tort claim. Vol19App4373–74 (citing *Dar El-Bina Engineering & Contracting Co. Ltd. v. Republic of Iraq*, 79 F. Supp. 2d 374, 383–84 (S.D.N.Y. 2000) (parties did not provide any information as to the content of applicable foreign law); *A.O.A. v. Rennert*, 350 F. Supp. 3d 818, 847 (E.D. Miss. 2018) (court applied forum law to U.S. tort claims where parties disagreed on applicable law); *Loebig v. Larucci*, 572

F. 2d 81, 85–86 (2d Cir. 1978) (parties agreed to instruct jury on New York law)). But here, the court and the parties all *agreed* that foreign law should apply (Vol20App4391), thus the court should have definitively determined and applied the causation standard under Colombian law. *See Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 431 (10th Cir. 2006) (reversing judgment and remanding for determination of Swiss law given that parties agreed it applied); *Twohy v. First National Bank of Chicago*, 758 F.2d 1185, 1189, 1193 (7th Cir. 1985) ("Rule 44.1 required a deeper inquiry into the law of Spain than that undertaken by the court below," because the parties agreed that Spanish law controlled).

But rather than determine Colombian law, the district court concluded in its summary judgment opinion that neither party sufficiently "illuminated the substantial contours" of the applicable causation standard. Vol19App4373–4374. The court asked for the first time in its opinion: "How does the element of 'causation' express in the secondary liability context under Colombian law?" and then proceeded to adopt a substitute standard incorrectly drawn from U.S. aiding-and-abetting law. Vol19App4371–4374.

Federal Rule 44.1 and the case law interpreting it required the district court to do much more than raise these questions and concerns for the first time in its opinion. At oral argument, the court did not raise any of these questions or ask any relevant questions about the causation standard. *See generally* Vol18App4152–

30

Vol19App4273. At a minimum, the court should have raised these concerns at oral argument or requested supplemental submissions.

The Supreme Court's teaching in *Animal Science* is that a court's Rule 44.1 inquiry should be comprehensive, even to the point of analyzing and rejecting a foreign state's views about the meaning of its own laws. *See Animal Science Prods. v. Hebei*, 585 U.S. 33, 42 (2018) ("Rule 44.1 frees courts 'to re-examine and amplify material . . . presented by counsel in partisan fashion or in insufficient detail.'" (citing Advisory's Committee's Note)). Upon finding the explanation of foreign law "too ambiguous," at the motion and oral argument stage, the district court required further discovery and supplemental submissions to discern foreign law, a practice endorsed by the Supreme Court. *Id.* at 46–47.

The court here, however, failed to conduct its own comprehensive review, and instead, raised its concerns for the first time in its summary judgment opinion. Then, at trial, the court refused to even consider supplemental Rule 44.1 declarations detailing the causation standard under Colombian law. *See supra* at 19–20. The court erred as a matter of law when it failed to determine the causation standard under Colombian law at summary judgment and again at trial.

### 2. Plaintiffs' Colombian Law Claims Require Proof of But-For Causation

This Court should enter judgment for Chiquita because Colombian law on the issue of causation is clear and easily ascertained from the parties Rule 44.1

submissions, and Plaintiffs conceded that they cannot satisfy the applicable standard. Vol25App5574 ¶ 27.

Plaintiffs' Colombian "negligence, wrongful death style claims," arise under Article 2341 of the Colombian Civil Code. Vol26App5761. Article 2341 claims have three elements: "(1) fault or affirmative intent to cause damage on the part of the defendant; (2) damages suffered by the plaintiff; and (3) a causal nexus between the fault and the damages." *See id*.

At summary judgment and at trial, Chiquita established that Colombian law requires a defendant's fault to be the but-for cause of a plaintiff's harm in order to impose liability under Article 2341. At summary judgment, Chiquita submitted a thorough Rule 44.1 declaration from Jorge Santos Ballesteros—a former justice of the Colombian Supreme Court. Vol16App3549–3597. Justice Santos' declaration quoted Colombian Supreme Court decisions that clearly articulate the applicable standard as but-for causation: "to say that a person's fault actually caused the damages claimed, there must be a necessary relationship between said fault and the damage; this means a relationship in which, if the fault had not occurred, the damage would not have occurred." Vol16App3557–3558. The but-for standard has been affirmed repeatedly by the Colombian Supreme Court. *See e.g.*, Vol16App3558 ("If a fault considered as related to the damage is fully proven but it is also found that the damage would have been caused, even if such fault had not taken place, there

will be no *causal link* or subsequent entitlement to reparation of the affected person.").

Plaintiffs also submitted a Rule 44.1 declaration from a former Colombian Supreme Court justice, Jaime Arrubla, who agreed that Colombian law requires a defendant's fault to be a but-for cause—that is, a cause-in-fact or "adequate" cause—of plaintiff's harm in order to impose liability. Vol17App3908 ¶¶ 56–58; Vol17App3910–3911n.39 (noting that under Article 2341 "[if] the damage would have been produced without the guilty conduct claimed, there is no liability[.]").

In its summary judgment opinion, the court questioned "[w]hether Colombian law recognizes [an] exception to 'but for' causation rules in the secondary liability context." Vol19App4373. But there is no "exception to 'but for' causation" expressed in either party's expert report because no such "exception" exists under Colombian law. As Justice Santos explained, even when there are multiple potential tortfeasors, but-for causation still applies. Vol16App3557–3559. And, as Justice Arrubla explained, if multiple potential tortfeasors' actions combine to cause harm, each individual can be held liable only so long as it is determined that "had they acted in isolation, the result [injury to the plaintiff] would have been the same." Vol17App3909–3910 ¶ 62; *see also* Vol16App3558.

The district court was wrong to ignore this agreement between both former Justices of the Colombian Supreme Court and, therefore, wrong to deny Chiquita

33

summary judgment. There is no record evidence (either at summary judgment or trial) that any decedent would still be alive but for Chiquita's extortion payments. Stated differently, there is no evidence that Chiquita's extortion payments, in isolation, could have caused Plaintiffs' deaths. Indeed, Plaintiffs conceded that there is no such evidence and that they cannot meet Colombia's but-for causation standard. Vol25App5574 ¶27. This Court should, therefore, enter judgment for Chiquita.

Given the district court's erroneous summary judgment ruling, Chiquita was forced to proceed to trial, yet tried again to have the court understand and apply the correct law. Chiquita submitted before trial a supplemental declaration from Justice Santos in support of its proposed jury instructions under Colombian law. Vol25App5692–5751. Justice Santos again explained that but-for causation is required even when multiple causes are alleged. Vol25App5696–5697, 5700–5704. Plaintiffs, however, scrapped Justice Arrubla's articulation of Colombian law causation in their proposed jury instructions, and instead submitted a Rule 44.1 declaration from a new expert, former Deputy Justice Pablo Rueda. Deputy Justice Rueda illogically concluded that because Colombia (like the U.S.) recognizes that *damages* can be imposed jointly and severally among tortfeasors—a concept irrelevant to causation—"[t]he applicable approach to causality in Colombian law, then, coincides with the approach adopted by the [c]ourt in its order on the Defendants' joint motion for summary judgment." *See* Vol25App5575. Like Arias at

34

summary judgment, Deputy Justice Rueda blanketly endorsed the district court's prior standard with no citation to any Colombian authority. *See id; see also supra* at 18, n.7. In any event, the court refused to consider either party's supplemental declaration on the issue of causation in lieu of "going with [its] standard throughout the case." Vol47App13134:14–13135:7.

Ultimately, the court not only absolved Plaintiffs of their burden to prove but-for causation but also, at Plaintiffs' urging, went so far as to actually instruct the jury that Plaintiffs did not need to prove but-for causation. *See* Vol61App13868 ("a Plaintiff does not have to prove that Chiquita's assistance was necessary for the injury to have occurred. In other words, a Plaintiff does not have to show the injuries would not have occurred 'but for' Chiquita's assistance").

Had the proper Colombian law but-for causation standard been applied, Chiquita would have prevailed at summary judgment and trial. Reversal is warranted.

> ### 3.     Important Policy Considerations Should Prevent a District Court from Ignoring Foreign Law and "Going With [Its Own] Standard"

There are good reasons why Courts of Appeals reverse district courts for failing to determine foreign law. Blindly substituting American domestic law could impair U.S. diplomatic relations with other countries, especially when it comes to lawsuits that seek to impose liability for violations that occur abroad. *See, e.g., Sosa*

*v. Alvarez-Machain*, 542 U.S. 692, 728 (2004) (allowing American courts to redefine foreign law would "raise risks of adverse foreign policy consequences").

Foreign nations, moreover, make conscious choices about when and how to impose civil liability for tortious acts—just like the United States. Colombia has decided to require but-for causation for primary and secondary tortfeasors, like Florida and most other states. Many nations may reasonably conclude that requiring actual causation/causation-in-fact/but-for causation is more just in that it properly cabins a defendant's liability. Nations (and U.S. states) very logically might decide that tort liability should only arise if conduct is an actual or but-for cause because that standard will invite foreign investment into the country—investment that is critical for economic development and "an essential foundation for human rights." *Jessner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1406 (2018) (plurality op.).

## B.     The District Court's "Aiding-and-Abetting" Standard Flouts Florida's Precedent

Compounding its errors in not ascertaining and applying Colombian law, the district court then erred in finding that Florida law would apply an aiding-and-abetting standard to Plaintiffs' wrongful death tort claim.

But Florida courts do not apply aiding-and-abetting standards to wrongful death negligence claims.[9] Like Colombia, Florida courts require plaintiffs to prove but-for causation in all negligence cases. *See* Florida Standard Jury Instructions in Civil Cases, Section 401, General Negligence, JICIV FL-CLE 401.12 Legal Cause, Notes on Use for 401.12, note 1 (but-for cause instruction "is to be given in all cases"). That is true even where there are multiple tortfeasors. *See id*. Indeed, a but-for causation instruction is expressly required even where an additional instruction on "concurring cause" may be given because that instruction "does not set forth any additional standard for the jury to consider" in determining whether a particular defendant's negligence was first-and-foremost a but-for cause of damage. *See id*.

Two decisions by this Court interpret the element of causation in negligence cases under Florida law. *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1223 (11th Cir. 2021); *Riley v. Tesla, Inc.*, No. 22-12515, 2025 WL 881387 (11th Cir. Mar. 21, 2025). In

---

[9] When the court looked to Florida law, it mistakenly relied only on a single banking fraud case from 2013: *Lesti v. Wells Fargo Bank N.A.*, 960 F. Supp. 2d 1311(M.D. Fla. 2013). Vol19App4374. But *Lesti* addressed the knowledge element of an aiding-and-abetting theory, not causation. Regarding the knowledge element, *Lesti* holds that the alleged aider and abettor had actual knowledge of the primary actor's underlying tort. *Lesti*, 960 F. Supp. 2d at 1325. But at summary judgment here, the court merely required evidence that Chiquita understood "the mission" of the AUC, without more. *See* Vol19App4373. At trial, the court rejected Chiquita's proposed alternative jury instructions requiring Plaintiffs to prove Chiquita's knowledge of the killing of each Plaintiffs' decedent. Vol38App8746-8747. Assuming that *Lesti* applied, the court's refusal to give this instruction regarding the knowledge element was highly prejudicial because there was no evidence at trial demonstrating that Chiquita had knowledge of any decedent's death.

both cases, the Court found that Florida courts require a "but-for" causation standard in negligent tort claims.

*Colon* is similar on its facts and instructive. The plaintiffs in *Colon* filed an ATA lawsuit against social media companies alleging that they aided and abetted an ISIS sympathizer, who murdered dozens of people in the Pulse Nightclub shooting. *Colon*, 14 F.4th at 1216, 1219. The plaintiffs also brought negligence claims under Florida law for wrongful death. *Id.* at 1216. With respect to causation, the plaintiffs argued that "because they have established proximate cause under the ATA (using the substantial factor/reasonable foreseeability standard) they have also satisfied proximate cause under Florida law." *Id.* at 1224. The Court found this argument to be a mistaken assumption, noting that Florida "employs a but-for/reasonable foreseeability standard for proximate cause." *Id.* at 1224, n.5. Ultimately, the Court affirmed dismissal of the wrongful death claim because the plaintiffs failed to cite "Florida cases (and other relevant authorities)" fleshing out the foreseeability component of proximate cause under Florida law. *Id.* at 1227.

In *Riley*, this Court recently articulated the Florida causation standard for negligence claims. As this Court explained:

> Florida courts generally use the "but-for" test for factual causation. *Stahl v. Metro Dade Cnty.* 438 So. 2d 14, 17 (Fla. Dist. Ct. App. 1983) . . . . That test requires the [p]laintiff to show that it is more likely than not that the [p]laintiffs' injury would not have occurred but for the defendant's tortious act. *See Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So.2d 1015, 1020 (Fla. 1984).

*Riley*, 2025 WL 881387, at *9. Importantly, this Court also explained that "Florida courts apply the 'but for' test, even when there are multiple dependent causes that combine to create a plaintiff's injury" and that "[c]oncurring causes are independent causes that alone could have produced the plaintiff's injury." *See id.* In *Riley*, the lack of fire protection material in a Tesla could not be considered a concurrent cause of the decedent's death in a car crash because it "could not have killed [decedent] by itself" and summary judgment in favor of Tesla was warranted because "there was no evidence for a reasonable jury to conclude that [decedent] would have survived but for the lack of intumescent material in his Tesla's battery pack." *Id*. at *10. The court concluded that "[b]ecause the lack of intumescent material is a dependent cause, rather than a concurring one under Florida law, the but-for test applies." *Id.* So too here, the but-for cause test applies because Chiquita's extortion payments alone could not have killed the decedents.

At trial, however, the court instructed the jury that it need only determine whether Chiquita's alleged assistance "substantially increase[d] the risk of terrorist acts by the AUC and the probability that the Plaintiff's relative would be a victim." Vol61App13867. Requiring Plaintiffs to prove only that a defendant's actions merely increased the likelihood of a decedent's death or decreased the decedent's chances of survival is not only wrong under Colombian law, it is "antithetical" to Florida's but-for causation standard. *See Gooding*, 445 So.2d at 1018–20. Both Colombian

39

law and Florida law impose the same causation standard and require the same result here—judgment in Chiquita's favor or a new trial with a proper but-for causation instruction.

### C. The District Court's Limitless Aiding-and-Abetting Standard Defies *Twitter*'s Central Requirement that a Defendant Consciously and Culpably Participate in the Underlying Tort as Something He Wished to Make Succeed

Shortly after the court issued its summary judgment opinion, the Supreme Court issued its landmark decision in *Twitter, Inc. v. Taamneh*, which not only controls ATA cases, but federal common law aiding-and-abetting cases more broadly. 598 U.S. 471 (2023). In *Twitter*, the Supreme Court held that aiding-and-abetting liability requires a plaintiff to prove that defendants "consciously" and "culpably 'associate[d themselves]'" with the underlying tort, "'participate[d] in [the underlying tort] as something that [they] wishe[d] to bring about,' or sought 'by [their actions] to make it succeed.'" *Id.* at 497–98 (citation omitted). The Court was clear that "[t]he focus must remain on assistance to the tort for which plaintiffs seek to impose liability," requiring a sufficient nexus between a defendant's alleged assistance and each specific wrongful act. *Id.* at 506. This nexus requirement prevents "boundless" and "overly broad liability[.]" *Id.* at 488–91.

The district court, however, ignored *Twitter*'s nexus requirement and instructed the jury that it may hold Chiquita liable if Chiquita "understood the mission of the organization because this amounts to knowingly contributing to the

organization's terrorist activities." Vol19App4373. That instruction improperly relieved Plaintiffs of their burden to prove the "conceptual core" of aiding-and-abetting liability: Chiquita's "conscious, voluntary, and culpable participation" in the AUC's killings with an intent to "make [them] succeed." *Twitter*, 598 U.S. at 493.[10]

In refusing to apply the guardrails established in *Twitter* to this case, the court incorrectly concluded that *Twitter* is a fact-specific decision under "the Anti-Terrorism Act, not common law." Vol23App5120. But *Twitter* does provide a lengthy and thorough discussion of federal common law aiding-and-abetting liability. Indeed, this Court and others have applied *Twitter* to aiding-and-abetting cases beyond the ATA context. *See, e.g.*, *United States v. White*, 2023 WL 9016456, at *6 (11th Cir. Dec. 29, 2023) (federal carjacking and firearm offenses context); *Amazon Services LLC v. United States Dep't of Agriculture*, 109 F.4th 573, 581 (D.C. Cir. 2024) (agricultural statute context). And, the district court's stated rationale for ignoring *Twitter* cannot be reconciled with its own reliance on *Boim* and *Atchley,* which were both ATA cases. *See* Vol19App4372–4373 (citing *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008) and *Atchley v AstraZeneca UK Limited*, 22 F.4th 204 (D.C. Cir. 2022)).

---

[10] In *Amazon Services*, the D.C. Circuit confirmed that *Twitter* resolved any previous "uncertainty on whether the common law of civil aiding-and-abetting liability requires a culpable mind." 109 F.4th at 581 (confirming that in *any* context: "secondary aiding-and-abetting liability . . . requires culpable, conscious participation in wrongdoing" not simply that harm merely be "foreseeable").

41

Instead of *Twitter*, the district court relied on *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which held a defendant liable for a murder committed by her boyfriend during a burglary, even though the defendant did not participate in the robbery and did not know her boyfriend was going to kill anyone. Vol23App5121. But *Twitter* makes clear that the result in *Halberstam* is the rare exception, not the rule. It applies only where the defendant's assistance to the entire enterprise is "so intentional and systematic" that the perpetrator could not have committed the tort without it. *Twitter*, 598 U.S. at 495.

Consider the facts in *Halberstam* as illustrated by the Supreme Court in *Twitter*. The defendant, Hamilton, "was a willing partner in all of Welch's criminal activities." *Id.* at 485 (internal citations and quotation marks omitted).

> Hamilton had lived with Welch for five years, during which time the couple had risen from modest circumstances to possess a substantial fortune. . . . This rapid ascent was remarkable because Welch had no outside employment. . . . Rather, he left the house most evenings and returned with antiques, jewelry, and precious metals—some of which he melted down into gold and silver ingots by using a smelting furnace that he had installed in their garage. Meanwhile, Hamilton did bookkeeping work for Welch's "business," facilitating the sale of those stolen goods. . . . She had Welch's customers make checks payable to her, falsified her tax returns at Welch's direction, and kept records of incoming payments from Welch's customers—with no records of outgoing funds to his "suppliers."

*Id.* at 485–86 (internal citations omitted). "Hamilton's assistance to Welch was so intentional and systematic that she assisted each and every burglary committed by Welch; any time that Welch left the house to burglarize, he would have relied on

42

Hamilton's assistance in laundering the stolen goods and transforming them into usable wealth." *Id.* at 495.

The facts here are miles away from *Halberstam*. There is no evidence that the kind of entanglement and commitment to a common enterprise that existed between Hamilton and Welch existed between Chiquita and the narcoterrorist AUC. Unlike in *Halberstam*, there is no evidence that Chiquita essentially assisted each and every drug deal, extortion, threat or murder committed by the AUC. And, there is no evidence that the AUC relied on Chiquita's extortion payments every time it acted as narcoterrorists. With its half billion-dollar annual income, the AUC clearly could have committed the torts here without Chiquita's *de minimis* extortion payments that amount to less than 0.04% of the AUC's annual cocaine revenues alone.

Here, the court did not require Plaintiffs to prove that Chiquita culpably intended to aid in the killing of any specific decedent. Nor did the court require Plaintiffs to prove that Chiquita "consciously and culpably participated" in the AUC's torts against the Plaintiffs' decedents as something Chiquita wished to bring about or sought by its actions to make succeed. *Twitter*, 598 U.S. at 1227. The court's standard cannot be reconciled with *Twitter* or *Halberstam*.

The district court's aiding-and-abetting standard also runs headlong into this Court's precedent. The Court defines "knowing" as an act done "voluntarily and intentionally." *See* Vol38App8756–8757 (citing *Samples v. Atlanta*, 915 F.2d 1548,

1550 n.1 (11th Cir. 1990); 11th Cir. Pattern Criminal Instruction B9.1A)). That is hardly the same thing as "understand[ing] the mission of the organization." Vol61App13867. This case illustrates why: Chiquita's payments were not "voluntary and intentional" but extorted and coerced by the narcoterrorists. Evidence of this fact came from the United States Government, the terrorists who did the extorting, and even the Plaintiffs themselves who testified that the AUC extorted everyone. Vol62App14172 ¶ 21; Vol62App14131–14133(58:21–63:14); Vol43App9842:19–21; Vol45App10218:7–11, 10220:5–14; Vol46App10438:19–10440:9. Had the jury been instructed that "knowing" meant "voluntary," the verdict would have been for Chiquita.

At trial, the district court required Plaintiffs to prove only that Chiquita assisted the AUC "to a degree sufficient to create a foreseeable risk of harm to others," including Plaintiffs' relatives, which relieved Plaintiffs of their burden under *Twitter* to prove a nexus between Chiquita's assistance and each decedent's killing. Vol19App4372; Vol61App13867 (jury instruction). As *Twitter* states, the "focus must remain on assistance to the tort for which plaintiffs seek to impose liability." 598 U.S at 506. The court's instruction focusing on the risk of harm to "others" improperly expanded liability far beyond the limits of *Twitter*.

In sum, Plaintiffs had to prove by a preponderance of the evidence that Chiquita "aided and abetted the [tort] that injured plaintiffs." *Id.* at 497, 503. Instead,

the court told the jury the opposite: "nor is any Plaintiff required to prove that Chiquita's assistance directly aided any specific murder." Vol61App13868. The district court "missed the gist" of *Twitter*.

### D. The Remedy Is Reversal and Judgment for Chiquita, or at Minimum a New Trial

The district court's failure—at summary judgment and at trial—to determine and apply Colombian causation law for Plaintiffs' Colombian tort claim was a pure legal error and highly prejudicial to Chiquita. Indeed, Plaintiffs concede that they cannot meet the proper but-for causation standard. *See, e.g.*, Vol25App5574 ¶ 27 (Plaintiffs' Rule 44.1 expert admitting it would be "impossible" to demonstrate that Chiquita was a but-for cause of decedents' killings). Accordingly, judgment for Chiquita is warranted. *See Rothstein v. Carriere*, 373 F.3d 275, 284–85, 289 (2d Cir. 2004) (reversing denial of summary judgment after trial on pure legal error and directing district court to enter judgment in favor of defendant); *Universe Sales Co.*, 182 F.3d at 1039 (reversing denial of summary judgment and granting cross-motion for summary judgment due to district court's error in determining applicable foreign law).

At a minimum, a new trial is warranted with proper jury instructions under Colombian law. Indeed, a new trial is warranted even if U.S. law could apply to the single element of causation because neither Florida law nor federal law support the court's erroneous instructions. *See Brink v. Direct General Ins. Co.*, 38 F.4th 917,

926 (11th Cir. 2022) (vacating and remanding for new trial where court refused to give defendant's proposed jury instruction that correctly stated law); *Pate v. Seaboard R.R., Inc.*, 819 F.2d 1074, 1083 (11th Cir. 1987) (remanding for new trial where instruction was "an incorrect statement of the law").

## II.    The District Court Committed Prejudicial Error by Submitting the Legally Deficient Hazardous Activities Claim Based on Instructions that Compounded and Further Diluted Its Erroneous Causation Instruction

Minutes after giving its erroneous causation instruction discussed above (a Plaintiff must prove Chiquita provided "support to a degree sufficient to create a foreseeable risk of harm to others, including that Plaintiff's relative"), the court gave an even more erroneous and prejudicial instruction on hazardous activity. That instruction told the jury it could find Chiquita liable for hazardous activity if its support "increased the risk to members of the community beyond those to which members of the community are normally exposed" and such hazardous activity was "to a degree sufficient to create a foreseeable risk of harm to others, including that Plaintiff's relative." Vol61App13871–13873.

The hazardous activity instruction repeated and compounded the error of the negligence causation instruction, telling the jury it could find Chiquita liable if its conduct merely increased the risk of terrorist attacks to any members of the community. In short, the inclusion of this instruction diluted the erroneous negligence causation instruction to the point of nearly limitless liability, running

"roughshod over the typical limits on tort liability and tak[ing] aiding and abetting far beyond its essential culpability moorings." *Twitter*, 598 U.S. at 503. These instructions are miles beyond the limits of tort liability required by Colombia's but-for causation standard.

Throughout the trial, Plaintiffs blended the two claims into an amorphous (and legally void) standard suggesting that Chiquita's conduct "increase[d] the risk" to Plaintiffs. *See e.g.*, Vol56App12903:11–14. By the time of closing argument, the thrust of Plaintiffs' theory was that Chiquita should be liable for the mere fact that by doing business in a dangerous country, it "increased the danger to everybody within that circle of terror." Vol60App13765:1–8; Vol59App13560:14–21.

The jury found Chiquita liable for engaging in hazardous activity. Vol61App13885. Although the district court properly granted Chiquita's Rule 50 motion (because Chiquita did not engage in a "hazardous activity" as a matter of law), it did so only after allowing the jury to find in Plaintiffs' favor on the legally deficient claim and the egregiously prejudicial instructions. The Rule 50 ruling did not cure the prejudicial impact on the jury because the jury's deliberation over the hazardous activity instruction and finding hazardous activity liability inevitably affected and led to its conclusion that Chiquita was liable under the erroneous negligence causation standard. A new trial is warranted. *See Hamm v. Powell*, 874 F.2d 766, 770 (11th Cir. 1989), *on reh'g in part*, 893 F.2d 293 (11th Cir. 1990)

(reversing jury verdict for plaintiffs on false arrest and excessive force claims because "although the district court properly granted a direct verdict in favor of the appellants (defendants) on the false arrest claim, it did not do so until after receiving the jury's verdict . . . . The jury's finding of insufficient cause to arrest led inevitably to a conclusion that the force employed in the arrest was excessive.").

## III.   The District Court Precluded Significant Witness Tampering Evidence, but Admitted Tainted Evidence and Unsworn Testimony

The district court refused to allow Chiquita to present highly probative and compelling evidence of Plaintiffs' counsel's witness payment, tampering, and suspected bribery scheme of AUC commander confessions of responsibility, which Plaintiffs relied heavily on to establish the AUC-involvement element of their case. And, the court allowed two categorically inadmissible presentations of evidence: 1) the tainted AUC commander confessions with no meaningful opportunity for cross-examination or rebuttal evidence; and 2) unsworn, sensational testimony from depositions in Colombia. This inadmissible evidence unduly prejudiced Chiquita and warrants a new trial.

### A.   The District Court Refused to Permit Cross-Examination as to Plaintiffs' Counsel's Improper Influence on Witnesses and the Bias of Those Witnesses

Despite voluminous evidence of witness tampering, the court prevented Chiquita's good-faith cross examinations of Plaintiffs' counsel and expert and excluded relevant documents substantiating the scheme without any investigation. A

48

court's preclusion of evidence under Fed. R. Evid. 403 "should be used sparingly" and "the balance should be struck in favor of admissibility." *Aycock v. R.J. Reynolds Tobacco Co*., 769 F.3d 1063, 1069 (11th Cir. 2014) (citation omitted). Under Rule 403, a court's "discretion to exclude evidence under Rule 403 is narrowly circumscribed" and the court must analyze the evidence "in a light most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact." *Id.* (citation omitted).

Chiquita's evidence of witness tampering was undoubtedly probative, as it went directly to the validity and credibility of Plaintiffs' essential evidence. At trial, Plaintiffs were required to prove that the decedents were killed by the AUC and the primary evidence that Plaintiffs and their expert relied on were purported "confessions" by AUC commanders Jose Gregorio Mangones and Raul Hasbún made in the Colombian Justice & Peace proceedings, accepting responsibility for deaths that occurred within the territories that the commanders controlled. Vol46App10414:21–10415:16; Vol59App13597:2–13597:6; Vol60App13634:7–13636:9; Vol59App13589:2–13590:3; Vol59App13591:10–18; Vol59App13592:20–22; Vol60App13608:22–13610:10; Vol60App13624:3–9. Before and at trial, Chiquita presented substantial evidence, including admissions from counsel, demonstrating that Plaintiffs' counsel, Terrance Collingsworth, offered or actually paid money to Mangones and Hasbún through their

representatives in order to both secure favorable testimony against Chiquita and other companies, and influence the Justice & Peace confession process. Vol30–35App6857–7977; Vol40App9031–9042; Vol59App13425–13544; Vol61App13838–13850.[11]

Chiquita sought to call Collingsworth as a witness at trial to attack the credibility of the Hasbún and Mangones "confessions" of responsibility for the deaths of certain decedents. Chiquita needed only a good faith basis in order to have wide latitude on such cross examination. *See Ward v. Nierlich*, No. 99-14227 CIV, 2006 WL 5412626, at *6 (S.D. Fla. Sept. 18, 2006); *United States v. Davis*, 261 F.3d 1, 38 (1st Cir. 2001) (instead of excluding testimony that a fact witness was paid "we prefer the rule that would leave the entire matter to the jury to consider in weighing the credibility of the witness-informant." (quotation marks and citations omitted)). Chiquita demonstrated this good faith basis by proffering Collingsworth's own emails, his sworn deposition testimony, and other Plaintiffs' counsel's sworn court admissions. *See supra* at 12–17.

Rather than contend with this evidence, the court simply credited Plaintiffs' counsels' self-serving declarations denying any wrongdoing. Vol38App8666. The court held that Collingsworth's anticipated denial on the stand would minimize any

---

[11] Collingsworth and C&S represent Plaintiffs Mariela Isabela Sierra Soto and Lina Maria Berdugo Lechuga.

probative value of Chiquita cross-examining him. Vol38App8665–8667. But Collingsworth's own emails and other Plaintiffs' counsel's sworn admissions would have shown the jury that any "denials" would not be credible and, instead, highly probative in demonstrating that the so-called "confessions" elicited from key fact witnesses were unreliable.

The court also hampered Chiquita's cross-examination of Plaintiffs' expert Oliver Kaplan on this topic, who opined that Mangones and Hasbún confessed to responsibility for the deaths of the decedents. The court prohibited Chiquita from questioning Kaplan about witness payments, summarily declaring "we're not getting into it." Vol46App10452:23.

In addition to hamstringing Chiquita's cross-examinations, the court also excluded documentary evidence demonstrating the witness payment scheme. Vol57App12926:5–12931:13. Throughout trial, the court failed to explain why any of Chiquita's documentary evidence was inadmissible. Despite repeated attempts to bring this evidence to the court's attention, the court summarily concluded, "I am not admitting any of these documents" and "I am going to deny your request"— without any further explanation or justification. Vol57App12928:3–6; 12931:10. The court's blanket preclusion of Chiquita's evidence abused the "narrowly circumscribed" discretion afforded to it under Fed. R. Evid. 403 *See Aycock*, 769 F.3d at 1069 (internal citations omitted).

The court also refused to acknowledge evidence of witness tampering *that Plaintiffs' counsel admitted to*. Vol38App8665–8667. For example, Chiquita presented Collingsworth's emails and Plaintiffs' counsels' sworn pleadings and deposition testimony admitting that Collingsworth provided Mangones with a script for what to say at his Justice and Peace proceedings. *See* Vol31App7044:9–20. Vol59App13470; *supra* at 13–15. Collingsworth also admitted that he had meetings with Mangones and Hasbún in 2008 and 2009, and produced his emails with his Colombian associates from this time period. In one email, Collingsworth's associate expressed the need for Collingsworth to pay Mangones "another 10 [thousand dollars]," (Vol59App13438) and noted "there is a danger that if we don't resolve the problem by the next hearing, [Mangones is] liable not to say what we want, or worse." Vol59App13459. Collingsworth remarkably replied: "I will resist telling him that we have friends who could take him out[.]" Vol59App13438. These emails lay out the "commitment" to make payments in installments amounting to $50,000 dollars (App13439) and are substantiated by Western Union bank receipts produced by Collingsworth. Vol59App13507–13513. In another email from July 2009, Collingsworth wrote about his upcoming meeting with Hasbún: "I need to bring a good faith down payment of 10k (the legal maximum you can carry as cash) . . . this meeting will break several of the [Chiquita] cases open and we need to meet this guy before he gets extradited." Vol59App13505.

The court's dismissal of substantial (and largely unrefuted) evidence of witness tampering, without even questioning any Plaintiffs' counsel, was an abuse of discretion. *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1327 (Fed. Cir. 2016) (reversing denial of motion for new trial where district court abused its discretion by "summarily dismissing" allegations of false witness testimony); *see also Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 537 (7th Cir. 2003) (reversing order denying motion for relief from judgment where allegation of witness tampering "required further investigation by the judge").

The tainted evidence was critical to Plaintiffs, who relied on it to establish the threshold issue of AUC involvement. *See supra* at 12. Without the tainted evidence, Plaintiffs would have not been able to establish AUC involvement in the decedents' deaths. Accordingly, the Court should reverse.

### B. The Unsworn and Unfairly Prejudicial Testimony of Ovidio Nuñez Cabrales and Carlos Bello Arrieta Warrants a New Trial

The district court improperly admitted the sensational, unsworn depositions of Ovidio Nuñez Cabrales and Carlos Bello Arrieta. Because their testimony was not subject to a penalty for perjury, it should have been excluded. *See* Fed. R. Evid. 603; *see also United States v. Fowler*, 605 F.2d 181, 185 (5th Cir. 1979); *United States v. Alvarez*, 837 F.2d 1024, 1029 (11th Cir. 1988) (affirming denial of request to take foreign deposition and stating "[f]oreign deposition testimony, because of the absence of a sanction for perjury, is suspect"), *cert. denied*, 486 U.S. 1026 (1988).

53

During discovery, the court required that deposition testimony taken in Colombia be given before a Colombian judge, as required by the Hague Evidence Convention (Vol16App3502–3503), or at least before a Colombian official, U.S. consular official, or Florida court reporter who would administer an oath commissioned by the court. Vol16App3505–3507. Five years after the close of discovery and mere weeks before trial, the court unexpectedly permitted Plaintiffs to take depositions that did not comply with this procedure. Nuñez and Bello were not required to appear in a Colombian court and were simply told by a non-Florida court reporter that: "You must promise under United States Law and before God to tell the truth, and only the truth. If the judge finds you did not tell the truth, he has the power to issue penalties." Vol37App8307(8:1–5); 8315:17–20. That "oath" did not impress upon two Colombian citizens any penalties for perjury, because it only referenced "United States law," and "the witness[es] [were] beyond the reach of the [U.S.] court." *United States v. Oudovenko*, No. 00-cr-1014, 2001 WL 253027, at *3 (E.D.N.Y. Mar. 7, 2001) (denying request to take foreign deposition).

Chiquita immediately objected to the deficient oaths before any testimony began. *See* Vol37App8307–8308(8:16–10:17); 8315–8316(7:24–9:20). After the depositions, Chiquita moved to exclude the testimony, but the court denied that motion. Vol36App8294–8297; Vol38App8657–8661. It concluded that Chiquita somehow "stipulated" to the oath by permitting a similar oath to be given previously.

54

Vol38App8660. That was incorrect. No witness deposed in Colombia before Bello and Nuñez was given the oath that they were given.

Unbounded by an enforceable penalty for perjury, Nuñez and Bello gave outlandish, uncorroborated testimony that unfairly prejudiced Chiquita and infected the trial.

Nuñez—a fired Banadex employee who then allegedly joined the AUC and murdered between 50 and 70 people (Vol61App14009–14010(58:7–18))—claimed that Banadex security personnel gave the AUC orders to "abduct" and "kill" Banadex's own employees. Vol61App14001(33:23–35:5); 14003–14004(37:16–41:20).[12] The court denied Chiquita's right to undermine the credibility of this testimony through cross-examination. Specifically, the court excluded Chiquita's cross of Nuñez at the deposition as to Nuñez' prior dishonesty at Justice and Peace proceedings on the grounds that there was no "admissible" evidence to support that impeachment.        Vol30App6760:11–6766:1;            Vol65App14947–14948;        Vol42App9567:2–9570:10; Vol42App9653:17–9657:21. The court also prevented

---

[12] This sensational and unsworn testimony was irrelevant to any of the Plaintiffs' decedents. Any probative value was substantially outweighed by unfair prejudice to Chiquita. Vol65App14962-14963. After it was played, Chiquita moved for a mistrial (Vol43App9695:2-9697:22), which the court denied stating: "I am going to deny the motion, if I haven't already denied it, and let the Eleventh Circuit decide whether I committed a reversible error. Maybe we will have to come back and do this all over again. But it will probably be with another judge." Vol43App9699:21-25.

Chiquita from introducing bias evidence from authenticated Banadex personnel records, which showed that the very Banadex employees who Nuñez implicated were those who led the investigation into his on-the-clock drunk driving accident that resulted in his termination. Vol52App11768–11772; Vol55App12533:19–20.

Next was Bello, a close friend of Nuñez, who worked for Banadex at Chiquita's port and provided uncorroborated testimony that Chiquita knew shipping containers coming through its port contained arms for the AUC. Vol61–62App14059–14061(47:11–53:08). Bello implicated another Banadex employee, Jovanny Hurtado, as authorizing the release of the containers despite knowing that they held guns. Vol62App14082(113:23–114:12).[13] Chiquita learned during trial that Plaintiffs' counsel, Jonathan Reiter, is Hurtado's lawyer in Colombian proceedings where Hurtado claims his innocence. *See* Vol58App13309; Vol59App13381–13383. Yet, the court precluded Chiquita from presenting this important fact to the jury. Vol57App12921:19–12926:2;  Vol60App13642:24–13646:7;  Vol60App13647:10–12.[14] The court also precluded Chiquita from introducing other documents demonstrating that neither Hurtado nor any other Banadex employee was found

---

[13] As with Nuñez, Chiquita objected to Bello's testimony to no avail (Vol65App14964-14965, 14974) and then made another motion for mistrial, which was summarily denied. Vol43App9857:24-9858:13.

[14] Reiter arranged for both the Nuñez and Bello depositions, stayed with the witnesses, paid for their meals, and even bought them clothes. Vol62App14066, 14073-14075; Vol61App14014-14017.

complicit in the arms smuggling. Vol58App13308–13424. Chiquita also sought to introduce Raul Hasbún's deposition testimony in *Perez v. Dole Food Co.*, which directly refuted Bello's false claim that Chiquita was complicit in the AUC's guns smuggling. Vol47App10741–10743. The court improperly refused to admit any of this evidence.[15] Vol53App12033:20–12037:7; Vol54App12447:17–22; Vol54–55App12447:25–12475:6; Vol57App12921:19–12926:2.

This unsworn testimony gave the jury the false impression that Chiquita directed the AUC to kill its own employees and assisted the AUC in guns smuggling, which no doubt unfairly prejudiced Chiquita. A new trial is warranted.

## IV.    At the Very Least, the Verdict Should Be Reduced to Comply with Colombia's Damages Caps

Under Colombian law, non-economic damages are capped to 212,000,000 pesos (approximately USD $51,706). Vol62App14248–14256 ¶¶39–59. Nevertheless, the district court denied Chiquita's motion to reduce damages in accordance with those caps. Vol62App14215–14317; Vol64–65App14680–14898;

---

[15] The court excluded this evidence on relevance and hearsay grounds. Vol57App12921:19-12926:2; Vol53App12033:20-12037:7, Vol53App12161:4-12162:14; Vol54App12447:17-22. But, because it was offered to contradict Bello's testimony, the evidence was neither irrelevant nor hearsay. *United States v. Calle*, 822 F.2d 1016, 1021 (11th Cir. 1987) ("[E]xtrinsic evidence which contradicts the material testimony of a prior witness is admissible." (quotation marks and citation omitted)); *United States v. Winkle*, 587 F.2d 705, 710 (5th Cir. 1979) ("[I]mpeachment to demonstrate the untruth of a witness' testimony is not excludable as hearsay"). Regardless, the documents were public records under Rule 803(6), and Hasbún's testimony satisfied Rules 804(b)(1) and 804(b)(3).

Vol65App14909–14913. This was error. *See McDaniel v. Petroleum Helicopters, Inc.*, 455 F.2d 137, 138 (5th Cir. 1972) (reversing trial court's refusal to apply Colombian noneconomic damages cap in wrongful death diversity case where decedent was killed in Colombia).

The court ruled that "Colombia law does not provide for caps" and that "even if there were caps, as Chiquita is a non-Colombian domiciliary, such caps would not apply to it." Vol65App14913. Both rulings were legally erroneous.[16]

First, the Colombian Supreme Court affirmed these caps, explaining that compensation for moral and psychological damage inflicted by the death of a close relative can "certainly not" exceed the values established by the Colombian Supreme Court. *See* Vol63App14503, 14511–14514. Indeed, Plaintiffs previously acknowledged the caps, admitting that: "the reparation of damages in Colombia is restricted to some maximum limits set by the high courts when dealing with compensation for non-pecuniary damages." Vol14App3038 ¶42; Vol13App2980 n.24.

Second, the court also misapplied language in *Foster v. United States*, 768 F.2d 1278 (11th Cir. 1985) and *Piamba Cortes v. American Airlines, Inc.*, 177 F.3d

---

[16] In arriving at its decision, the court concluded that Chiquita did not address certain case law (*see* Vol65App14912), however, Chiquita's post-trial motion in fact addressed those cases extensively. Vol62App14224–14232; Vol64App14687–14690.

1272 (11th Cir. 1999) stating that "a limit on recovery should not be applied when there is no domiciliary defendant because it advances no policy behind the limitation." Vol65App14912. But *Foster* involved neither a damages cap nor Colombian law. And while *Piamba* referenced this policy implication in the context of Colombian law, it found that that the balance of policy interests weighed *in favor* of applying Colombia's damages scheme over Florida's. *See Piamba*, 177 F.3d at 1301 (Florida "possesses no interest in compensating domiciliaries of other jurisdictions more richly than they would receive in their own courts.").

More broadly, the balance of policy interests weighs in favor of applying the Colombian damages scheme because the caps seek to ensure equality and equity among plaintiffs—regardless of whether the defendant is a domiciliary. *See* Vol64App14709–14714 ¶¶38–57; *Bhatnagar by Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1234 (3d Cir. 1995) (non-economic damages to foreign plaintiff should not be "comparable to what a similarly situated American would receive in *this* country" but rather "comparable to what a similarly situated plaintiff would have received" in their country). Plaintiffs recovered 40–50x more than the maximum they would have received in Colombian courts. That is not equitable, and no policy—foreign or domestic—supports that outcome.

This Court ultimately declined to apply Colombian damages law in *Piamba* because, in 1999, it had difficulty "ascertaining" that law. 177 F.3d at 1302. This

Court did not have the benefit of the many recent Supreme Court cases explicitly affirming the caps, including the one from May 2024. The law on caps has been clear for many years post-*Piamba*. Indeed, the law was clear enough for Plaintiffs to admit that the caps applied in 2015—sixteen years after *Piamba*.

## Conclusion

This Court should vacate and enter judgment in favor of Chiquita or, in the alternative, remand for a new trial. At a minimum, this Court should reduce damages as required by Colombian law.

Dated:    April 11, 2025

Respectfully submitted,

*/s/ Michael L. Cioffi*
Michael L. Cioffi
Thomas H. Stewart
BLANK ROME LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, OH 45202
(513) 362-8701/04
michael.cioffi@blankrome.com
tom.stewart@blankrome.com

Frank A. Dante
Melissa F. Murphy
Michael A. Stoolman
Serena S. Gopal
BLANK ROME LLP
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
(215) 569-5645/5334

60

frank.dante@blankrome.com
melissa.murphy@blankrome.com
michael.stoolman@blankrome.com
serena.gopal@blankrome.com

*Counsel for Defendant–Appellant*
*Chiquita Brands International, Inc.*

## Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

Pursuant to Fed. R. App. P. 32(g)(1), I certify that this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,949 words according to a word count using Microsoft Word, the word-processing software used to prepare the document. Pursuant to Fed. R. App. P. 27(d)(1)(E), I certify that this document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document was prepared in a proportionally spaced typeface, 14-point Times New Roman font.

Dated:     April 11, 2025                    */s/ Michael L. Cioffi*
                                              Michael L. Cioffi

62

**Certificate of Service**

I hereby certify that I electronically filed this document with the Clerk of the Court using the ECF system on April 11, 2025 which will automatically generate and serve by e-mail a Notice of Docket Activity on Attorney Filers under Fed. R. App. P. 25(c)(2).

*/s/ Michael L. Cioffi*
Michael L. Cioffi